IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION


PATRICIA M. EVANS                                              PLAINTIFF


        v.              Case No. 05-3010


CNA GROUP LIFE ASSURANCE COMPANY,
and BAXTER HEALTHCARE CORPORATION                             DEFENDANTS


_____

                    **MEMORANDUM OPINION & ORDER**

        Plaintiff brings this action pursuant to the provisions of the

Employee Retirement Income Security Act of 1974 ("ERISA"), 29

U.S.C. § 1001 *et seq.*, challenging defendant's decision to deny her

application for long-term disability benefits.

        The defendant submitted the administrative record (the "AR")

that was before the claims administrator.  (Doc. 6)  In addition,

the plaintiff has submitted a "supplemental administrative record"

(Doc. 11), which contains information not provided to the defendant

for the initial determination of benefits or for the defendant's

review on appeal.

        The parties have submitted briefs (Docs. 18, 21) on the issues

before the Court and the matter is now ripe for consideration.  For

the reasons set forth herein, the decision of the defendant will be

upheld, the plaintiff's claim will be denied, and this case will be

dismissed.

1. **Baxter Healthcare Corporation's Motion to Dismiss** -- First, it is necessary to address **Separate Defendant Baxter Healthcare Corporation's Motion to Dismiss for Failure to State a Claim** (Doc. 13). In the motion, Baxter Healthcare Corporation (hereinafter "Baxter") seeks dismissal pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Baxter states that, according to the plaintiff's complaint, plaintiff was a former employee of Baxter who is entitled to certain employee welfare benefits sponsored by Baxter. The benefits were provided to Baxter employees through a policy of insurance issued by CNA Group Life Assurance Company (now known as Hartford Life Group Insurance Company and referred to herein as "CNA").

Baxter argues that since plaintiff has failed to allege that Baxter is the party in control of administering the benefit determination, her claim against Baxter should be dismissed in accordance with precedents of the Eighth Circuit Court of Appeals. *See* Layes v. Mead, Inc., 132 F.3d 1246, 1249 (8th Cir. 1998).

2. The plaintiff has not responded to Baxter's motion to dismiss.

3. The Court finds that Baxter's motion should be, and it hereby is, **granted.** A review of the Administrative Record reflects that claims administration was handled exclusively by CNA and that Baxter played no part in the decision to deny the long-term

benefits.  Accordingly, plaintiff's claim against Baxter should be dismissed.  See <u>Layes v. Mead Corp</u>., 132 F.3d 1246 (8th Cir. 1998).

## Background

4.   The Plaintiff, Patricia M. Evans, worked for Baxter on the assembly line.  Her job required of her repetitive movement and overhead reaching from waist to shoulder once a minute for periods of two hours at a time.  (AR 112, 229-230).  Her last day of work was February 6, 2001.  (AR 276)

5.   Plaintiff participated in an employee benefits plan sponsored by Baxter and issued and administered by CNA. (AR 30)  On or about February 22, 2001, plaintiff gave notice to CNA of her claim for short-term disability benefits.[1]  (AR 275) Plaintiff described her condition as back pain, thoracic, hip pain, rib cage pain, and right breast pain.  (AR 275) Short-term disability benefits were ultimately approved for the plaintiff for the maximum length of short-term disability – a period of time continuing until August 21, 2001.  (AR 268, 264, 263, 251, 246, 235, 218, 204, 199)

6.   By letter dated August 31, 2001, CNA notified plaintiff that her claim for long-term disability benefits had been approved, and the period from February 28, 2001 through August 21, 2001 had been used to satisfy the policy's elimination period.  (AR 197-198) The letter also notified plaintiff that, after her monthly benefit

---

[1]  Plaintiff's claim for short-term disability benefits is not at issue in this case.

was payable for twelve (12) months, she would continue to receive benefits only if she were continuously unable to engage in any occupation for which she is, or became, qualified by education, training or experience.  (AR 197-198)

7.    The employee benefits plan is funded by policy number SR-83079247.  (AR 10) The terms of the policy define *disability* as follows:

**How do We define Disability?**

*Disability* or *Disabled* means that *You* satisfy the Occupation Qualifier or the Earnings Qualifier [not applicable in this case] as defined below:

**Occupation Qualifier**

*Disability* means that *Injury or Sickness* causes physical or mental impairment to such a degree of severity that *You* are:

> 1) continuously unable to perform the *Material and Substantial Duties of Your Regular Occupation*; and
>
> 2) not working for wages in any occupation for which *You* are or become qualified by education, training or experience.

After the *Monthly Benefit* has been payable for 12 months, *Disability* means that, *Injury* or *Sickness* causes physical or mental impairment to such a degree of severity that *You* are:

> 1) continuously unable to engage in any occupation for which *You* are or become qualified by education, training or experience; and
>
> 2) not working for wages in any occupation for which *You* are or become qualified by education, training or experience.

(AR 14).

4

8.   The Policy further requires proof of disability as follows:

**Proof of *Disability***

The following items, supplied at *Your* expense, must be a part of *Your* proof of loss.  Failure to do so may delay, suspend or terminate *Your* benefits.

> 1)   The date *Your* Disability began;
>
> 2)   The cause of *Your* Disability;
>
> 3)   The prognosis of *Your* Disability;
>
> 4)   Proof that *You* are receiving Appropriate and Regular Care for *Your* condition from a Doctor, who is someone other than *You* or a member of *Your* immediate family, whose specialty or expertise is the most appropriate for *Your* disabling condition(s) according to *Generally Accepted Medical Practice*.
>
> 5)   Objective medical findings which support *Your* Disability.  Objective medical findings include but are not limited to tests, procedures, or clinical examinations standardly accepted in the practice of medicine, for *Your* disabling condition(s).
>
> 6)   The extent of *Your* Disability, including restrictions and limitations which are preventing *You* from performing *Your Regular Occupation*.
>
> 7)   Appropriate documentation of *Your Monthly Earnings*. If applicable, regular monthly documentation of *Your Disability Earnings*.
>
> 8)   If *You W*ere contributing to the premium cost, *Your* Employer must supply proof of *Your* appropriate payroll deductions.
>
> 9)   The name and address of any *Hospital or Health Care Facility* where *You* have been treated for *Your Disability*.

**Continuing Proof of Disability**

*You* may be asked to submit proof that *You* continue to be

> *Disabled* and are continuing to receive *Appropriate and Regular Care of a Doctor*. Requests of this nature will only be as often as *We* feel reasonably necessary. If so, this will be at *Your* expense and must be received within 30 days of *Our* request.

(AR 23-24)

9.    The Policy also grants Discretionary Authority to the administrator:

> **Discretionary Authority**
>
> The Policy is delivered in and is governed by the laws of the governing jurisdiction and to the extent applicable by the Employee Retirement Income Security Act of 1974 (ERISA) and any amendments thereto. When making a benefit determination under the policy, *We* have discretionary authority to determine *Your* eligibility for benefits and to interpret the terms and provisions of the policy.

(AR 10)

10.    The documentation submitted in support of plaintiff's claim for disability benefits reflects the following:

\*    In her original claim for short-term benefits, the plaintiff listed Dr. Robert Ahrens as her attending physician. (AR 275). Dr. Ahrens referred her to Dr. Knox and Dr. McBride for an evaluation. (AR 275) According to the plaintiff's claim for short-term benefits, at the time she stopped working she had been taking Synthroid, Procardia XL, Triant HCTZ, Vioxx, Prednisone, Hydrocodone, Glucophage, and Lamisil. (AR 275)

\*    The plaintiff saw Thomas E. Knox, M.D. on February 19, 2001. Dr. Knox noted that Dr. Ahrens referred the plaintiff for

evaluation of soreness in her thoracic spine which radiates around the right side, basically in a dermatomal pattern of the ribcage. Dr. Knox also stated that Dr. Ahrens obtained a MRI scan of her thoracic spine which did not show a thoracic disk, and that a bone scan is pending. Dr. Knox noted no particular trigger points, and stated that he would review the bone scan and call Dr. Ahrens with suggestions. The bone scan was completed and showed increased activity at the T6 pedicle, although the plaintiff's MRI scan through this area was normal. Dr. Knox noted that he would have Dr. McBride evaluate the plaintiff as well. (AR 206)

\* Anthony McBride, M.D. assessed the plaintiff on February 28, 2001. Dr. McBride noted that the plaintiff was experiencing thoracic pain with radiating right rib cage pain. Plaintiff advised Dr. McBride that she was taking Percocet for the pain which does help relieve the symptoms. Dr. McBride noted a moderate thoracic kyphosis, and mild scoliosis. Dr. McBride assessed the plaintiff as having thoracic pain with degenerative disk disease and osteophyte formation. Dr. McBride suspected that nerve root irritation is causing the chest wall pain. Dr. McBride prescribed Neurontin 300mg three times a day, and noted that if it fails to relieve the symptoms he would try a T6 nerve block. (AR 207)

\* The plaintiff returned for a visit with Dr. Ahrens on March 28, 2001. Dr. Ahrens noted that she has had two epidural steroid injections without relief of her symptoms and that she is

still having significant right-sided chest wall pain.  Dr. Ahrens noted that he would have the plaintiff try a TENS unit in an attempt to provide some relief.  (AR 208)

 *    The plaintiff again visited with Dr. Ahrens on May 1, 2001, as she returned for an evaluation of her chronic thoracic pain syndrome.  Dr. Ahrens noted that the plaintiff had found some relief with the TENS unit, but stated that if it does not provide substantial relief in the long run, he might refer the plaintiff to the Arkansas Pain Center for consideration of a possible dorsal column stimulator.  (AR 208)

 *    M. Carl Covey, M.D. evaluated the plaintiff on May 29, 2001.  The plaintiff was referred to Dr. Covey's clinic by Dr. Ahrens for consultation, evaluation, suggestions and assistance in management.  Dr. Covey noted that the plaintiff had come to the clinic primarily for the pain of her bilateral chest, although she experiences pain on her right side much more than her left.  The plaintiff also complained of bilateral lower extremity burning pain below the knee and low back pain that bothers her when she walks. Dr. Covey noted that the plaintiff's thoracic spine exam reveals inner spinous tenderness and inner costal groove tenderness, right much greater than left and it is consistent with roughly T-5, 6 region.  Dr. Covey prescribed Neurontin, 200 mg and decided to set the plaintiff up for diagnostic fluoroscopically directed inner coastal nerve blocks on the right side.  Dr. Covey also noted that

if the prescribed treatment is successful, he would offer the plaintiff a cryoneurolysis of inner coastal nerves. (AR 240-242)

* On June 13, 2001, the plaintiff had an intercostal nerve block right T6, T7 and T8 performed by Dr. Covey. (AR 237-238)

* Throughout the plaintiff's period of short-term disability, CNA monitored her condition through doctor reports. On March 5, 2001, Dr. Ahrens, noting that the plaintiff had been off work since February 7, 2001 with right thoracic radiculopathy, stated "I have no way of telling you when this lady will be able to return to work. She has taken narcotics daily just to tolerate the pain." (AR 267)

* On March 24, 2001, Dr. Ahrens noted "No progress." (AR 265)

* On April 15, 2001, Dr. Ahrens reported "Remains unable to work." (AR 262)

* On April 20, 2001, Dr. Ahrens noted "Still cannot work." (AR 256)

* On May 4, 2001, Dr. Ahrens noted "not improved." (AR 254)

* In a letter to CNA on May 23, 2001, Dr. Ahrens reported that the plaintiff "remains basically unimproved . . . . [the plaintiff] is extremely depressed about this situation and wants nothing more than relief and to return to work. I have absolutely no one in my practice more motivated to work than [the plaintiff]

and if it is possible, she will return to work if she can."  (AR 248)

* On June 6, 2001, Dr. Ahrens noted "Still can't work." (AR 222)

* On June 21, 2001, Dr. Ahrens noted, "Can't work."  (AR 222)

* In a letter to CNA dated July 10, 2001, Dr. Ahrens notes the plaintiff "remains unchanged.  She requires several Percocet daily to maintain any level of comfort. . . . Current attempts by Dr. Covey . . . are, I feel, [the plaintiff's] best hope at any chance to return to any level of decent function – but this is going to take a considerable while.  Depression is also a factor secondary to the severe chronic pain and inability to work. . . . [The plaintiff] is absolutely unable to work.  In my entire practice, I would say no one is more motivated than this patient and if it was remotely possible, she would much prefer to work as opposed to staying home.  She cannot do her job or any other job at present."  (AR 220)

* On July 26, 2001, CNA requested an evaluation of the plaintiff's permanent restrictions from Dr. Ahrens.  (AR 217)  Dr. Ahrens responded on August 6, 2001 that he could not assess permanent restrictions.  Dr. Ahrens noted that the plaintiff "cannot even sit for 8 hours.  The patient relates there are days she only gets out of bed for bathroom needs.  Other days she is up

and down persistently. Reaching and twisting of the torso consistently aggravates her pain." Further, Dr. Ahrens noted that the plaintiff "is consistently taking Percocet, several a day, to keep the pain under control." Finally, Dr. Ahrens deferred to Dr. Covey's diagnosis of intercostals neuritis/neuralgia rather than thoracic radiculopathy. (AR 203)

\* On August 29, 2001, the plaintiff returned to Dr. McBride for a visit. Dr. McBride noted the pain management attempts by Dr. Covey, and stated "At this point, there is nothing further I can offer her. This may be a life long problem. She can return as needed." (AR 194)

\* In September of 2001, CNA forwarded its "Return to Work Planning Guide" to Dr. McBride to assess the plaintiff's limitations. Dr. McBride returned the form, dated September 26, 2001. (AR 196) Dr. McBride noted that the plaintiff could not sit for more than four hours per day, walk for more than four hours per day, bend for more than one hour per day, stand for more than four hours, or climb for more than four hours per day. Further, Dr. McBride noted that the plaintiff could lift up to 25 pounds for up to four hours per day, and carry up to ten pounds for up to four hours each day. Dr. McBride restricted the plaintiff to only rarely bending at the waist, stooping, or squatting. Dr. McBride indicated that the plaintiff could occasionally push or pull with

her arms or legs or body, and only occasionally drive an automobile. (AR 196)

\* In November of 2001, CNA forwarded to Dr. McBride the "Functional Assessment Tool" to assess the plaintiff's current level of functionality. Dr. McBride completed the form on November 20, 2001. When asked on the form "Do you feel your patient is currently capable of performing work at this time with alternating sitting and standing and lifting less than 10 pounds?" Dr. McBride responded affirmatively. (AR 184)

\* CNA conducted a telephone interview of the plaintiff on December 4, 2001. During the interview, the plaintiff stated that she had no high school diploma or specialized training. Further, the plaintiff stated that she was in constant pain, and cannot sit, stand, twist or turn for any long periods of time. The plaintiff stated that she also has "Cardiomegaly and Hypertension" that make her short of breath and affect her overall status in addition to her "being very large." The plaintiff stated that there are some days when she doesn't get out of bed, and that she is depressed because of the constant pain. Finally the plaintiff stated that the nerve blocks did not help, and that she would work if she could. (AR 64)

\* On December 19, 2001, CNA forwarded the "Functional Assessment Tool" to Dr. Ahrens, attaching Dr. McBride's response to it for Dr. Ahrens' review. (AR 183) Dr. Ahrens completed the form,

dating it January 2, 2002.  When asked if the plaintiff is capable

of performing the activities allowed by Dr. McBride's evaluation,

Dr. Ahrens answered "No," as the plaintiff is "on daily multiple

narcotics for pain."  (AR 182)

11.  On January 18, 2002, CNA wrote to the plaintiff, noting

that the plaintiff's "own occupation" period for long term

disability benefits would end August 21, 2002.  (AR 182-183) The

letter explained:

> In a Planning Guide dated 9/26/01, Dr. McBride has stated
> that you are able to return to full time employment with
> the option to stand if needed with restrictions of no
> lifting greater than 10 pounds.  Dr. Ahrens states that
> you are unable to work due to multiple narcotic use for
> pain, but the medical evidence reviewed does not support
> a level of severity that would keep you from performing
> alternative employment with reasonable restrictions.
>
> You provided the information that you worked as an
> Assembler and have performed this type of work for 9
> years.  You also report having a 9th grade education. .
> . .
>
> Based upon your current level of function, coupled with
> your past vocational/educational history, I have
> determined that you are not able to perform the duties of
> your occupation of Assembler as it was performed but can
> perform alternative work by the end of your own
> occupation period.  The following are examples of some
> alternative occupations: Telephone Operator, Dispatcher,
> and Ticket Booth Cashier.  These are occupations that you
> could perform with your current education and work
> history.
>
> Based on the current medical and vocational documentation
> in the file, your claim will end on 8/21/02.  Please let
> me know if your situation changes or if you have any
> questions.

(AR 172-173)

12. On June 5, 2002, CNA again wrote to the plaintiff, confirming that the benefits period was scheduled to end on August 21, 2002, largely restating the information provided in the letter of January 18, 2002. (AR 133-134) The June 5, 2002 letter further advised the plaintiff of her appeal rights:

> If you disagree with our decision, you have the right to appeal under regulations specified by the Employee Retirement Income Security Act (ERISA) 1974 as amended. If you have additional medical information not mentioned above or wish us to reconsider our decision, you should: submit your formal request for reconsideration in writing to my attention within 60 days of the date of this letter . . . .
>
> Our decision will be reconsidered at the time of receipt of your information. If this information does not alter our decision, you will be informed of this and your claim will then be submitted for a formal review. A ruling will be issued within 60 days of receipt of your appeal as mandated by the Employee Retirement Income Security Act (ERISA) 1994, as amended. This regulation allows an additional 60 days to reach a decision if necessary, however you will be notified within the first 60 days if this will require an extension of time to reach a decision. This decision will be in writing and mailed directly to you or your representative.

(AR 134)

13. In a letter dated June 6, 2002, Dr. Ahrens wrote to CNA in protest of its decision. Dr. Ahrens stated:

> [the plaintiff] has asked me to write you regarding her continued disability. Her situation remains unchanged and, at present, has even deteriorated. I have cared for [the plaintiff] for 29 years now and have always been impressed with her work ethic. In the past, through multiple injuries, surgeries and illness, [the plaintiff] has always returned to work ahead of schedule at her own insistence. This time, this is beyond her. Her use of narcotics has increased, she is basically miserable 24 hours a day and is being referred to Arkansas Spine Clinic for further evaluation.

14

I repeat, [the plaintiff's] personality is such that if
employment of <u>any</u> sort was possible, she would take any
job possible.  It is not possible in any shape, fashion
or form.

May you have a personal conversation with God eventually
over this decision.

(AR 90, 128)

14.  On June 21, 2002, CNA contacted the plaintiff by letter,
confirming receipt of Dr. Ahrens' letter dated June 6, 2002.  (AR
126) The letter further confirmed that the plaintiff had not yet
been evaluated by the Arkansas Spine Center, reviewed both Dr.
McBride's and Dr. Ahrens' evaluations, and summarized that:

    although there are findings regarding your medical
    conditions, the additional medical evidence does not
    support a functional impairment precluding you from
    performing the alternative occupations listed in the
    previous letter of 6/5/02.  Therefore the decision that
    your long-term disability benefits are payable through
    8/21/02 remains unchanged.  Please note your appeal
    rights are still in effect.

(AR 126)

15.  In July of 2002, the plaintiff was referred to St. John's
Physicians and Clinics in Springfield, Missouri by Dr. Ahrens.  (AR
76-77)  The plaintiff was evaluated there by Stanley P. Hayes, M.D.
of the Department of Rheumatology.  Dr. Hayes noted the plaintiff's
medical history and that "specific diagnosis is not known."  Dr.
Hayes also noted that the plaintiff reports that "she is functional
to do personal care but she does no household activities, meal
preparation, shopping, etc., which is all performed by her
husband."  Dr. Hayes lists as current medications Celexa, Lorcet

15

Plus, Percocet, Glucophage, Vioxx, Procardia, Maxzide, and Levoxyl. Dr. Hayes reviewed an X-ray report provided by Dr. Ahrens and dated June 25, 2002. The thoracic spine films showed hypertrophic spurring; the cervical spine was not remarkable; and, the lumbar spine described some degenerative disk disease at L 1-2 and L 5-S1. The hip x-rays were normal; the right ankle x-ray was normal; and, the right foot x-ray showed old fractures to the metatarsals. The wrist x-ray was normal; the right knee x-ray showed joint-space narrowing and some hypertrophic spurring; and, the left knee x-ray showed minimal degenerative changes only. (AR 76-87) Dr. Hayes concluded that the plaintiff has "generalized soft tissue pain typical for fibromyalgia. This would appear to be the predominant source of her overall symptoms." Further, Dr. Hayes noted "she has hypertrophic osteoarthritis radiographically documented in her thoracic spine and right knee." Dr. Hayes suggested amitriptyline at bedtime to try to improve her "nocturnal rest pattern," and encouraged the plaintiff to pursue a walking program. Finally, Dr. Hayes suggested a continuation of Vioxx for the plaintiff's osteoarthritis. (AR 76-77)

16. On August 8, 2002, the plaintiff wrote to CNA to appeal its decision with respect to her long-term benefits. The plaintiff stated that she did not agree with Dr. McBride's opinion, specifically stating that she did not see how she could possibly lift 25 pounds or climb for 4 hours. She further stated that she had trouble standing, walking, and sitting because of the constant

pain and burning in her feet, legs and back. Additionally, she stated that she felt it would be harmful to her health to try to retrain for any type of work, "both physically and mentally." Finally, she included the July 2002 evaluation from Dr. Hayes which diagnosed her as having fibromyalgia. (AR 47-48)

17. On August 12, 2002, CNA acknowledged receipt of the plaintiff's August 8 appeal letter, and noted that the letter asked for "reconsideration to the decision terminating . . . long-term disability benefits as of 8/21/02." (AR 45-46) The letter also confirmed receipt of medical information from Dr. Ahrens dated 6/25/02 and 7/25/02. CNA concluded that

> although the medical evidence does support findings, these findings do not support an impairment precluding you from performing the alternative occupations listed in the original assessment of 1/18/02. Therefore, the decision that your benefits will end on 8/21/02 remains unchanged.

(AR 45-46) CNA also forwarded the plaintiff's letter for formal review:

> your letter of appeal has been forwarded for a formal review with the rest of your file. A ruling will be issued within 60 days of receipt of your appeal as mandated by the Employee Retirement Income Security Act (ERISA) 1974 as amended. This regulation allows an additional 60 days to reach a decision if necessary, however you will be notified within the first 60 days if this review will require an extension of time to reach a decision. This decision will be in writing and mailed directly to you or your representative.

(AR 45-46)

18. On September 26, 2002, CNA notified the plaintiff that her appeal was denied. (AR 43-44) Specifically, CNA reported:

According to the information within your file, you ceased work on 2/6/01, due to back and thoracic. The medical supported that you were unable to perform the duties of your own occupation and CNA provided benefits for the your own occupation maximum period of 12 months in accordance with the policy provision, which ended on 8/21/02.

In an interview with CNA on 4/26/01 you reported that you were able to perform your personal care, perform light cooking (microwave food) able to drive for short distances and do a little laundry. You reported that you are unable to lift heavy pots or sit longer than 15 minutes.

Dr. McBride provided restrictions and limitations and signed a release for you to return to gainful employment that consist of low activity level work.

A CNA vocational case manager performed an assessment of your claim file, and concluded that you were functionally capable of low activity level occupations (sedentary type work). The vocational case manager provided a sample of these types of occupations, not all inclusive, that were listed in the denial letter written on 6/05/02.

In an interview with CNA's vocational case manager, you reported that you were able to do some driving, housework and on some days you were bed bound.

While we understand that you may have continued symptoms of discomfort, they do not prevent you from performing your activities of daily living. We further relied on the expertise of the vocational manager who concluded that you were capable of low activity work. Dr. McBride provided CNA with a release to return to gainful employment and although we understand that your general practitioner disagrees with this decision, Dr. McBride is the specialist that you were referred to for your condition. Although we acknowledged that you are no longer capable of performing your own occupation, the evidence presented does not support a continuous functional impairment that would preclude you from performing low activity level occupations.

Therefore, after comprehensive review of the medical evidence, the decision that was made by CNA was correct and benefits were paid accordingly for 12 months through 8/21/02, in accordance with the policy provision for own

occupation period.  We are sorry that our ruling could not be more favorable; however, we must abide by the medical evidence and the policy provisions.  This completes the review offered by the appeals process and your file remains closed.

(AR 43-44)

19.  In a letter dated July 31, 2003, the plaintiff again contacted CNA "in regard to the closing of my case and loss of benefits on my long term disability."  (AR 58) The plaintiff asked that her July 31, 2003 letter be considered her "appeal in the closing and loss of long term benefits."  And advised that CNA would be hearing from her attorney "in the near future."  (AR 58)

20.  In a letter dated September 11, 2003, Rick Spencer, attorney for the plaintiff, contacted CNA to advise that he would represent her in her claim for long term disability insurance.  (AR 55) Spencer also requested a copy of "all medical records which you used in denying her claims as well as a copy of the contract that allows you to deny her her benefits."  (AR 55)

21.  Two additional letters from Rick Spencer are included in the Administrative Record.  In a letter dated September 22, 2003 Mr. Spencer requests that CNA consider the letter "our formal request of your denial for long term benefits for the above mentioned case."  (AR 53) And, in a letter dated January 10, 2005, Rick Spenser states:

> We have not heard from you regarding the appeal of this claim.  Please update us on your progress on the appeal. If you are not reviewing this claim please begin your process.  Enclosed is a copy of our request dated September 22, 2003 requesting your review of this file.

19

(AR 52)

22. On January 12, 2005, CNA wrote to Mr. Spencer, acknowledging receipt of his January 10, 2005 letter, which included a copy of this September 22, 2003 letter. Although CNA notes that it did not, before, have a copy of the September 22, 2003 letter, it did have a copy of Spencer's September 11, 2003 letter. Further CNA notes that it completed Mr. Spencer's request for a copy of the plaintiff's records by letter dated October 2, 2003. CNA advised that after its decision was upheld on appeal on September 26, 2002, the plaintiff's appeal rights were complete and there are no further appeal reviews available. CNA finally notes that the plaintiff does have civil remedies available. (AR 38-42)

## Discussion

23. **Standard of Review** -- ERISA provides a plan beneficiary with the right to judicial review of a benefits determination. *See* 29 U.S.C. § 1132(a)(1)(B). A denial of benefits by a plan administrator must be reviewed *de novo* unless the benefit plan gives the administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan, in which case the administrator's decision is reviewed for an abuse of discretion. *See* **Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989).** Under the terms of plaintiff's employee benefits plan, the plan administrator has "discretionary authority to determine . . . eligibility for benefits and to interpret the terms

20

and provisions of the policy." (AR 10) Accordingly, defendant's decision should be reviewed for an abuse of discretion.

24. Under the abuse-of-discretion standard, the Court must determine whether a reasonable person could have reached the same decision. *See* **House v. Paul Revere Life Ins. Co.**, **241 F.3d 1045, 1048 (8th Cir. 2001)**. This inquiry focuses on the presence or absence of substantial evidence supporting the administrator's decision. *Id.* While the administrator's decision need not be supported by a preponderance of the evidence, there must be "'more than a scintilla.'" *Id.* (citations omitted).

25. Although the plaintiff's employee benefits plan clearly provides discretionary authority to the administrator, and is therefore subject to the abuse of discretion standard, in her brief, the plaintiff appears to argue that a conflict of interest should alter the standard of review.

Although a conflict of interest *could* affect the standard of review, "not every allegation of impartiality alters the standard of review. A plan beneficiary is not entitled to less deferential review absent material, probative evidence demonstrating that a palpable conflict of interest existed, which caused a serious breach of the administrator's fiduciary duty." Farley v. Arkansas Blue Cross and Blue Shield, 147 F.3d 774, 776 (8th Cir. 1998). Moreover, a conflict of interest of a level sufficient to affect the standard of review "will ordinarily be apparent on the face of

the administrative record . . . [t]hus, the district court will only rarely need to permit discovery and supplementation of the record to establish these facts." Id. at n.4. *See also* **Abram v. Cargill, Inc.**, **2003 WL 1956218 (D.Minn. 2003).**

Plaintiff's pleadings in this case *fail* to point to any portion of the administrative record, or other evidence, to support her claim of a conflict of interest. Therefore, plaintiff's argument concerning a conflict of interest will not affect the standard for this Court's review – which remains *abuse of discretion.*

26. **Record on Review** -- CNA has submitted the administrative record (the "AR") that was before the claims administrator. (Doc. 6) In addition, the plaintiff has submitted to the Court a "supplemental administrative record" (Doc. 11) which contains information not provided to the defendant for the initial determination of benefits or for the defendant's review on appeal.

Specifically, the "supplemental administrative record" contains medical records dated *after* CNA's final determination on September 26, 2002. Not only were the medical records produced after CNA's final determination on appeal, there is no evidence that the records were *ever* submitted to CNA. Plaintiff has offered no explanation as to why the documents submitted as the "supplemental administrative record" should be considered by this Court.

This Court's function is to conduct a review of the record that was before the administrator of the employee benefit plan when the claim was denied.  *See* **Farfalla v. Mutual of Omaha Ins. Co.**, **324 F.3d 971, 974-75 (8th Cir. 2003)**.  Having given no "good cause" for the admission of this additional evidence, the plaintiff will not be allowed to supplement the record with these documents.  See **Brown v. Seitz Foods, Inc.**, **140 F.3d 1198, 1200-1201 (8th Cir. 1998)**.  Accordingly, the Court's review shall be limited to the administrative record filed by the defendant (Doc. 6); and, the record filed by the plaintiff (Doc. 11) will not be considered.

27.  **Defendant's Denial of Benefits** -- In its decision denying plaintiff benefits, CNA found that plaintiff's file did not support a finding that she remains disabled from any occupation.  CNA found that the medical and vocational documentation does not support the conclusion that the plaintiff is unable to perform alternative employment on a full time basis.  (AR 49-50) Specifically, CNA found that, with training, the plaintiff could perform jobs with duties similar to a dispatcher, ticket sales personnel, or telephone operator.  (AR 49-50) CNA cited Dr. McBride's opinion of the plaintiff's abilities in support of its decision and, although it noted that Dr. Ahrens (plaintiff's general practitioner) disagreed and was of the opinion that plaintiff could not return to any kind work due to her continuing pain and her need for pain medications, indicated its preference for the former's opinion by

noting that "Dr. McBride is the specialist that you were referred to for your condition." CNA concluded that the evidence would not support a continuous functional impairment that would preclude plaintiff from performing low activity level occupations. (AR 49-50)

28. As set forth above, the decision to deny the plaintiff long-term disability benefits is being reviewed by this Court for abuse of discretion. Under the abuse-of-discretion standard, the Court must determine whether a reasonable person could have reached the same decision. *See* **House v. Paul Revere Life Ins. Co.**, **241 F.3d 1045, 1048 (8th Cir. 2001).** This inquiry focuses on the presence or absence of substantial evidence supporting the administrator's decision. Id. While the administrator's decision need not be supported by a preponderance of the evidence, there must be "'more than a scintilla.'" Id. (citations omitted).

Although the record certainly indicates -- as documented by Dr. Ahrens -- that the plaintiff experiences pain on a daily basis, and that regular narcotics are necessary to attempt to control that pain, there is also evidence -- as documented by Dr. McBride -- to support the notion that the plaintiff can perform the duties of certain occupations. The evidence on which Dr. McBride based his opinion (that plaintiff can perform work-related activities involving limited sitting, walking, climbing and lifting) is

clearly more than a "mere scintilla" and CNA could properly rely upon it. Moreover, there is no requirement that CNA accept the opinion of Dr. Ahrens and reject that of Dr. McBride especially where it articulates some reason for preferring the latter over the former (i.e. that Dr. McBride was the specialist). Cf. **Delta Family-Care Disability v. Marshall**, **258 F.3d 834 (8th Cir. 2001)**. ("Where the record reflects conflicting medical opinions, the plan administrator does not abuse its discretion in finding the employee not to be disabled.")

Accordingly, the Court is obliged to conclude that the information before CNA was sufficient to support its denial of benefits. *See* **House v. Paul Revere Life Ins. Co.**, **241 F.3d 1045, 1048 (8th Cir. 2001)**.

## Conclusion

29. Based on the foregoing, the Court concludes that CNA's decision to deny plaintiff benefits in supported by sufficient evidence to withstand plaintiff's challenge. Accordingly, CNA's decision must be affirmed; plaintiff's claim must be denied; and plaintiff's complaint must be dismissed.

IT IS, THEREFORE, ORDERED that **Separate Defendant Baxter Healthcare Corporation's Motion to Dismiss for Failure to State a Claim** (Doc. 13) should be, and it hereby is, **GRANTED**, and

plaintiff's complaint with respect to **Separate Defendant Baxter Healthcare Corporation** is **DISMISSED.**

**IT IS, FURTHER, ORDERED** THAT the decision of CNA Group Life Assurance Company that plaintiff, Patricia M. Evans, is not eligible for long-term disability benefits under the ERISA benefits plan maintained by her employer, Baxter Healthcare Corporation, is **AFFIRMED** and plaintiff's complaint challenging that decision is **DENIED** and this case is **DISMISSED** with each party to bear her or its own costs and attorney's fees.

IT IS SO ORDERED this 31st day of August, 2006.


/S/JIMM LARRY HENDREN
JIMM LARRY HENDREN
UNITED STATES DISTRICT JUDGE